**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

       v.

BENJAMIN REYNOLDS,

                Defendant.

Case No. 1:19-cv-05631-MKV

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR**
**ENTRY OF FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL**
**MONETARY PENALTY, AND OTHER STATUTORY AND EQUITABLE RELIEF**
**<u>AGAINST DEFENDANT BENJAMIN REYNOLDS</u>**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

I.      PROCEDURAL HISTORY ...........................................................................1

II.      SUMMARY OF FACTS .............................................................................3

     A.      Reynolds's Fraudulent Scheme..........................................................3

     B.      Facts Relating to Damages.................................................................6

III.      ARGUMENT ...............................................................................................7

     A.      Final Judgment by Default Is Warranted Under Federal Rule
            of Civil Procedure 55 ........................................................................7

            1.      The Court Has Jurisdiction, and Venue Properly Lies
                   in This District ........................................................................8

            2.      The Well-Pleaded Complaint Establishes That Reynolds's
                   Fraudulent Scheme in Connection with Contracts of Sale
                   of Bitcoin, a Commodity in Interstate Commerce, Violated
                   Section 6(c) of the Act and Regulation 180.1
                   (Count I – Fraud by Deceptive Device or Contrivance) .........................10

                   a.      Reynolds's Prohibited Conduct ...................................11

                   b.      In Connection with a Contract of Sale of a
                         Commodity in Interstate Commerce.............................13

                   c.      Scienter ......................................................................14

     B.      Remedies and Damages .....................................................................15

            1.      Permanent Injunction ..............................................................15

            2.      Restitution, Civil Monetary Penalty, and
                   Post-Judgment Interest ............................................................16

                   a.      Restitution ..................................................................17

                   b.      Civil Monetary Penalty...............................................18

i

c.      Post-Judgment Interest .................................................................. 20

IV.    CONCLUSION ................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page**

### CASES

*Bricklayers & Allied Craftworkers Local 2, Albany,*
*N.Y. Pension Fund v. Moulton Masonry & Constr., LLC,*
   779 F.3d 182 (2d Cir. 2015)........................................................................8

*Cement & Concrete Workers Dist. Council Welfare Fund v.*
*Metro Found. Contractors Inc.,*
   699 F.3d 230 (2d Cir. 2012)...................................................................... 16

*CFTC v. Arrington,*
   998 F. Supp. 2d 847 (D. Neb. 2014) ........................................................ 19

*CFTC v. British Am. Commodity Options Corp.,*
   560 F.2d 135 (2d Cir. 1977)...................................................................... 15

*CFTC v. Dean,*
   No. 18-cv-00345, 2018 WL 4573029 (E.D.N.Y. July 9, 2018).............. 19

*CFTC v. Emerald Worldwide Holdings, Inc.,*
   No. 03-cv-8339, 2005 WL 1130588 (C.D. Cal. Apr. 19, 2005) .............. 20

*CFTC v. Gelfman Blueprint, Inc.,*
   No. 17-cv-7181, 2018 WL 6320656 (S.D.N.Y. Oct. 16, 2018)........ 11, 13

*CFTC v. Hunter Wise Commodities, LLC,*
   21 F. Supp. 3d 1317 (S.D. Fla. 2014) ...................................................... 17

*CFTC v. McDonnell,*
   287 F. Supp. 3d 213 (E.D.N.Y. 2018) ..................................................... 13

*CFTC v. McDonnell,*
   332 F. Supp. 3d 641 (E.D.N.Y. 2018) ......................7, 11, 12, 13, 14, 15, 17, 18, 19

*CFTC v. Morgan, Harris & Scott, Ltd.,*
   484 F. Supp. 669 (S.D.N.Y. 1979) .......................................................... 16

*CFTC v. My Big Coin Pay, Inc.,*
   334 F. Supp. 3d 492 (D. Mass. 2018) ...................................................... 13

*CFTC v. Noble Wealth Data Info. Servs., Inc.,*
   90 F. Supp. 2d 676 (D. Md. 2000) ....................................................... 11-12

*CFTC v. R.J. Fitzgerald & Co.,*
    310 F.3d 1321 (11th Cir. 2002) ...................................................................... 11, 14, 15

*CFTC v. Rolando,*
    589 F. Supp. 2d 159 (D. Conn. 2008) ................................................................. 11, 19

*CFTC v. Ross,*
    No. 09-cv-5443, 2014 WL 6704572 (N.D. Ill. Nov. 26, 2014) ............................ 17

*CFTC v. SK Madison Commodities, LLC,*
    No. 14-cv-02025, 2014 WL 3887755 (S.D.N.Y. June 9, 2014) ........................... 19

*CFTC v. TFS-ICAP, LLC,*
    415 F. Supp. 3d 371 (S.D.N.Y. 2019) ....................................................................9

*CFTC v. Trimble,*
    No. 11–cv–02887, 2013 WL 317576 (D. Colo. Jan. 28, 2013) ....................... 18-19

*CFTC v. 4X Solutions, Inc.,*
    No. 13-cv-2287, 2015 WL 9943241 (S.D.N.Y. Dec. 28, 2015) ........................... 16

*Fishman v. Philadelphia Fin. Life Assurance Co.,*
    No. 11-cv-1283, 2016 WL 2347921 (S.D.N.Y. May 3, 2016) ............................. 14

*FTC v. Instant Response Sys., LLC,*
    No. 13-cv-00976, 2015 WL 1650914 (E.D.N.Y. Apr. 14, 2015) ......................... 18

*Hosking v. New World Mortg., Inc.,*
    570 F. App'x 28 (2d Cir. 2014) ...............................................................................8

*Iglesias v. United States,*
    848 F.2d 362 (2d Cir. 1988) ....................................................................................7

*Porter v. Warner Holding Co.,*
    328 U.S. 395 (1946) ...............................................................................................17

*Press v. Chem. Inv. Servs. Corp.,*
    166 F.3d 529 (2d Cir. 1999) ..................................................................................14

*SEC v. Aaron,*
    605 F.2d 612 (2d Cir. 1979) ..................................................................................15

*SEC v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010) ...................................................................13

*SEC v. Lorin*,
    76 F.3d 458 (2d Cir. 1996) ........................................................................... 18

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) ......................................................................... 16

*SEC v. Syndicated Food Servs. Int'l, Inc.*,
    No. 04-cv-1303, 2010 WL 3528406 (E.D.N.Y. Sept. 3, 2010) ......................... 9-10

*SEC v. Zandford*,
    535 U.S. 813 (2002) .............................................................................. 13, 14

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,
    373 F.3d 241 (2d Cir. 2004) ........................................................................... 8

## STATUTES

Section 1a(9) of the Commodity Exchange Act,
    7 U.S.C. § 1a(9) (2018) ................................................................................ 13

Section 1a(13) of the Commodity Exchange Act,
    7 U.S.C. § 1(a)(13) (2018) ........................................................................... 13

Section 6(c)(1) of the Commodity Exchange Act,
    7 U.S.C. § 9(1) (2018) .............................................................................. 9, 10

Section 6c(a) of the Commodity Exchange Act,
    7 U.S.C. § 13a-1(a) (2018) ........................................................................ 8, 15

Section 6c(d)(1) of the Commodity Exchange Act,
    7 U.S.C. § 13a-1(d)(1) (2018) ....................................................................... 18

Section 6c(d)(3)(A) of the Commodity Exchange Act,
    7 U.S.C. § 13a-1(d)(3)(A) (2018) ................................................................... 17

Section 6c(e) of the Commodity Exchange Act,
    7 U.S.C. § 13a-1(e) (2018) ....................................................................... 9, 10

Servicemembers Civil Relief Act,
    50 U.S.C. § 3901 *et seq.* (2018) ..................................................................... 8

28 U.S.C. § 1331 (2018) .................................................................................. 9

28 U.S.C. § 1345 (2018) .................................................................................. 9

28 U.S.C. § 1961(a) (2018) ............................................................................. 20

**REGULATIONS**

Commission Regulation 143.8(a)(4)(ii)(B),
    17 C.F.R. § 143.8(a)(4)(ii)(B) (2019) ...................................................................... 18

Commission Regulation 143.8(b)(1)
    17 C.F.R. § 143.8(b)(1) (2019) ................................................................................ 18

Commission Regulation 180.1(a),
    17 C.F.R. § 180.1(a) (2019) ................................................................................. 9, 10

**RULES**

Federal Rule of Civil Procedure 55(b)(2) .................................................................... 1, 7

Local Civil Rule 55.2(b) .................................................................................................. 1

Pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Civil Rule 55.2(b), and in accordance with the Court's order dated July 10, 2020 (ECF No. 31), Plaintiff Commodity Futures Trading Commission ("Commission") submits this Memorandum in support of its request that the Court enter final judgment by default against Defendant Benjamin Reynolds ("Reynolds") and issue a final order that finds him liable for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2018), and its implementing regulations ("Regulations"), 17 C.F.R. pts. 1.1-190.10 (2019), and grants permanent injunctive relief, restitution, and a civil monetary penalty.  The Commission also submits the Declarations of Julia C. Colarusso ("Colarusso Decl."), Dmitriy Vilenskiy ("Vilenskiy Decl."), and Kyong J. Koh ("Koh Decl."), along with their supporting exhibits.[1]

## I.     PROCEDURAL HISTORY

On June 17, 2019, the Commission filed a Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties ("Complaint" or "Compl.") against Reynolds and Control-Finance Limited ("Control-Finance"), an entity that Reynolds incorporated in the United Kingdom and fully controlled,[2] for violations of the Act and Regulations.  ECF No. 1.  The Complaint alleges that, from at least May 2017 through October 2017 (the "Relevant Period"), Reynolds and Control-Finance operated a fraudulent virtual currency scheme by soliciting

---

[1] In accordance with Local Civil Rule 55.2(b) and Attachment A to the Court's Individual Rules of Practice in Civil Cases, copies of the Complaint, the Clerk's Certificate of Default, and the Proof of Service of the Summons and Complaint are attached to the Colarusso Decl.  In addition, Declarations signed by five customers who suffered losses from Reynolds's unlawful conduct are attached to the Koh Decl.  The declarants identify, summarize, and describe other documents supporting their statements.  To reduce the volume of materials accompanying this Motion, the Commission has not attached those other documents as exhibits to the Declarations or otherwise included copies of them as part of its submission.  However, to the extent the Court would like to review any additional documents, the Commission will provide them.

[2] The Complaint also originally named Control-Finance as a Defendant in this action.  On April 3, 2020, the Commission filed a Notice of Voluntary Dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) seeking to dismiss Control-Finance from the case given its status as a defunct entity.  ECF No. 26.  The Court granted that request on April 6, 2020.  ECF No. 27.

customers to deposit Bitcoin with them for the purpose of trading, falsely representing that they were earning trading profits on behalf of their customers, and then misappropriating the Bitcoin that was entrusted to them.  Compl. ¶¶ 1-10, 25-91.

Reynolds has represented himself to be a U.K. national residing in Manchester, England, Control-Finance's sole Director, and the sole owner of all equity shares in Control-Finance. Compl. ¶ 19; Koh Decl. ¶¶ 11-12.  Despite diligent efforts, the Commission was unable to identify a specific address where Reynolds could be served with process.  After exhausting all other options, the Commission sought leave to serve Reynolds by publication in the United Kingdom pursuant to Federal Rule of Civil Procedure 4(f)(3).[3]  ECF Nos. 16-19.  Judge Koeltl granted that request on January 7, 2020 (the "January 7 Order").  ECF No. 20.  As required by the January 7 Order, the Commission published a notice about the case in *The Daily Telegraph*, a U.K. newspaper, once a week for four consecutive weeks, and the notice included the text of the Summons and a statement describing how a copy of the Complaint could be obtained.  *See* ECF No. 21.  The Commission then filed a Proof of Service with the Court on March 3, 2020.  *Id.*

The January 7 Order obligated Reynolds to respond to the Complaint within twenty-one days from the date of the Commission's last publication in *The Daily Telegraph*.  ECF No. 20. As set forth in the Commission's Proof of Service, the last publication occurred on February 8, 2020.  ECF No. 21.  Accordingly, Reynolds was required to respond to the Complaint on or before March 2, 2020.  Reynolds failed to answer or otherwise respond to the Complaint, and, to date, he has not appeared to defend this action.

---

[3] The Commission's efforts to locate and serve Reynolds are detailed in the Memorandum of Law and Declaration of Julia C. Colarusso that were submitted in support of the Commission's Motion for Leave to Serve Reynolds by Publication.  ECF Nos. 17 & 18.  As set forth in those papers, it appears that Reynolds falsified his address in the application he filed with the U.K. government to incorporate Control-Finance and also actively worked to conceal his whereabouts by disabling the Control-Finance Website and the email addresses and telephone number he utilized in connection with the scheme at issue in this case.  *See* ECF No. 18 ¶¶ 6, 9, 12, 15, 17.

On April 3, 2020, pursuant to Federal Rule of Civil Procedure 55(a), the Commission filed a request for a Certificate of Default against Reynolds.  ECF Nos. 24-25.  The Clerk of Court entered Reynolds's default on April 6, 2020.  ECF No. 28.  On July 10, 2020, the Court ordered the Commission to file a motion for default judgment on or before August 20, 2020. ECF No. 31.  The Commission now moves for a final judgment by default against Reynolds pursuant to Federal Rule of Civil Procedure 55(b)(2).

## II.    SUMMARY OF FACTS

As set forth above, Reynolds has failed to file any responsive pleading, and the Clerk of Court entered default against him.  Accordingly, pursuant to Federal Rule of Civil Procedure 8(b)(6), the factual allegations in the Complaint, except those related to the amount of damages, are deemed admitted for purposes of this Motion.  Reynolds's violations of the Act and the Regulations are also conclusively established by the record evidence below.

### A.    Reynolds's Fraudulent Scheme

As alleged in the Complaint, incorporated herein by reference, during the Relevant Period Reynolds fraudulently induced customers to purchase Bitcoin, a virtual currency and a commodity in interstate commerce, from third-party vendors and to thereafter transfer the Bitcoin to Control-Finance for trading in virtual currency markets.  Compl. ¶¶ 2, 25; Declaration of Shane Boulware (Ex. 3 to Koh Decl.) ("Boulware Decl.") ¶¶ 6-7, 11-12, 17-19; Declaration of Daniel Stratton (Ex. 5 to Koh Decl.) ("Stratton Decl.") ¶¶ 3-10, 20-22.  Reynolds operated the scheme primarily through a public website, www.control-finance.com (the "Control-Finance Website"), various social media accounts (including Facebook, YouTube, and LinkedIn, among others), and email communications, all of which he used to promote his supposed trading methods, abilities, and profits in order to entice prospective and existing customers to open

Control-Finance accounts and deposit their Bitcoin with him.  Compl. ¶¶ 26-61.

Customers who were enticed to deposit Bitcoin with Control-Finance were provided a deposit confirmation webpage through the Control-Finance Website.  Compl. ¶ 41; Koh Decl. ¶ 8(a).  Each deposit confirmation webpage identified the quantity of Bitcoin deposited and the value of that Bitcoin in U.S. dollars.  Compl. ¶ 41.  In addition, each deposit confirmation webpage identified the purported daily "Profit" that Control-Finance promised to pay to customers on each deposit.  *Id.*

Reynolds solicited customers by making false and misleading claims and omissions about the performance of Control-Finance.  Among other things, Reynolds and Control-Finance:

(1)    falsely represented on the Control-Finance Website and on Control-Finance's social media accounts that they traded customers' Bitcoin deposits in virtual currency markets and employed expert virtual currency traders who managed the deposits and generated guaranteed daily and monthly trading profits for customers (Compl. ¶¶ 3, 47(a)-(d); Koh Decl. ¶¶ 8(e), 14-22, 32-33);

(2)    falsely represented on the Control-Finance Website and on Control-Finance's social media accounts that they took security measures to preserve customers' investments and practiced risk diversification and trade allocation strategies to protect customers from volatility (Compl. ¶¶ 47(e)-(h); Koh Decl. ¶¶ 21(d)-(g));

(3)    fabricated weekly "Trade Reports" on the Control-Finance Website to falsely reflect virtual currency trading transactions that had not occurred and trading profits that did not exist (Compl. ¶¶ 4, 50-54; Koh Decl. ¶¶ 8(f), 28-30; Stratton Decl. ¶¶ 17-19);

(4)    constructed an elaborate affiliate marketing network that relied on fraudulently

promising to pay outsized referral profits, rewards, and bonuses to encourage customers to refer new customers to Control-Finance (Compl. ¶¶ 6-7, 34-40, 55-57; Koh Decl. ¶¶ 8(c), 24-26; Stratton Decl. ¶¶ 11-16; Declaration of Michael Anthony (Ex. 4 to Koh Decl.) ("Anthony Decl.") ¶¶ 3-5);

(5)     created sham accounts for customers on the Control-Finance Website that falsely reflected growing balances when in reality those accounts were empty (Compl. ¶¶ 27, 41-45);

(6)     falsely represented on the Control-Finance Website that customers could withdraw their profits "at any time" (Compl. ¶ 41);

(7)     failed to disclose that they misappropriated customers' Bitcoin deposits (Compl. ¶ 48); and

(8)     failed to disclose that they diverted portions of new customers' Bitcoin deposits to other customers in the manner of a "Ponzi" scheme (Compl. ¶¶ 5, 45, 48, 78-80; Koh Decl. ¶¶ 8(d)-(e)).

In reality, Control-Finance's purported trading results were illusory, and Reynolds and Control-Finance did not trade Bitcoin on customers' behalf, did not employ expert traders or specialists, did not pay referral rewards or bonuses, and retained customers' Bitcoin deposits for their own personal use. Compl. ¶¶ 27, 41-61; Koh Decl. ¶¶ 8(e), 23, 27, 31, 34. Reynolds also offered a profit "reinvestment" option to create disincentives to account withdrawals. Compl. ¶ 44; Boulware Decl. ¶¶ 13, 21. By offering customers the option to reinvest their "profits" into a program that on its surface appeared to be highly profitable, Reynolds concealed and prolonged his fraud by convincing customers that their deposits were rising in value, causing customers to leave their deposits in their Control-Finance accounts rather than request withdrawals. Compl. ¶

44.

Reynolds abruptly terminated operations in September 2017 by removing the Control-Finance Website from the Internet and deleting advertising content from Control-Finance's social media accounts.  *Id*. ¶¶ 8, 82; Koh Decl. ¶ 35; Bouleware Decl. ¶ 24; Anthony Decl. ¶ 6; Stratton Decl. ¶ 29.  In an attempt to conceal the scheme and lull customers into believing that the shutdown was temporary, Reynolds fraudulently represented through email and Facebook that Control-Finance would resume operations and make all customers whole by returning their Bitcoin deposits by late October 2017.  Compl. ¶¶ 9, 33, 83-91; Bouleware Decl. ¶¶ 24-26, 28-34; Anthony Decl. ¶¶ 7-8; Stratton Decl. ¶¶ 30-43.  He instead misappropriated customers' Bitcoin through thousands of circuitous blockchain transactions.  Compl. ¶¶ 10, 90.

### B.    Facts Relating to Damages

During the Relevant Period, Reynolds and Control-Finance ultimately solicited and misappropriated at least 22,190.542 Bitcoin, valued at approximately $143,000,000, from more than 1,000 customers worldwide, including at least 169 who reside within the United States. Compl. ¶¶ 1, 8, 25, 40, 62-69; Koh Decl. ¶ 8(b); Vilenskiy Decl. ¶¶ 15, 27-30.[4]  In typical transactions, customers logged into the Control-Finance Website and accessed the deposit webpage.  The Control-Finance Website then generated a unique single-use wallet address ("Single-Use Address(es)") for the specific deposit.  After a customer deposited Bitcoin with the Single-Use Address, Reynolds and Control-Finance routed the deposit out of the Single-Use

---

[4] The amount of misappropriated Bitcoin and its approximate value cited in this Memorandum and in the proposed judgment submitted herewith are slightly less than the figures alleged in the Complaint.  For purposes of calculating customer losses and the monetary gain to Reynolds, the Commission has opted only to include Bitcoin transfers that it was able to directly confirm with CoinPayments, Inc., a virtual currency payment processor organized in Vancouver, Canada from which the Commission obtained documents and other information during its investigation of this matter.  The other Bitcoin transfers referenced in the Complaint were sent to payment processors with which the Commission has not directly communicated.  Accordingly, out of an abundance of caution, the Commission has excluded those other transfers from its damages calculations.  The figures cited in this Memorandum are explained in more detail in the Vilenskiy Decl. submitted in support of the Motion.

Address and into one of a number of pooled wallet addresses ("Pool Address(es)") under their control, where the deposit was combined with numerous deposits by other customers.  Reynolds and Control-Finance then transferred the Bitcoin in each Pool Address to other wallet addresses under their control.  Compl. ¶¶ 62-77; Vilenskiy Decl. ¶¶ 15-16, 18-26, 31-34.  As a result, Control-Finance's customers have lost most if not all of their invested funds.  Compl. ¶¶ 62-77; Koh Decl. ¶¶ 8(e), 9; Declaration of David Regan (Ex. 1 to Koh Decl.) ¶¶ 5-7; Declaration of Alvin Lewis (Ex. 2 to Koh Decl.) ¶¶ 4-7; Boulware Decl. ¶ 27; Anthony Decl. ¶ 9; Stratton Decl. ¶¶ 28, 43.

In accordance with the proper measure of damages for misappropriation of assets of fluctuating value, the Commission has valued the customer deposits at issue using Bitcoin's closing price on October 31, 2017—the date by which customers were promised the return of their Bitcoin.  Vilenskiy Decl. ¶ 30; *see Iglesias v. United States*, 848 F.2d 362, 364 (2d Cir. 1988) ("Where the subject of the conversion had a fluctuating value, the measure of damages was its value at the time of conversion or within a reasonable time after the discovery of the conversion, whichever is higher.").[5]

## III.   ARGUMENT

### A.   Final Judgment by Default Is Warranted Under Federal Rule of Civil Procedure 55.

Federal Rule of Civil Procedure 55(b) authorizes litigants to seek default judgment against a party who has failed to plead or otherwise defend an action.  Fed. R. Civ. P. 55(b).

---

[5] The Commission assessed the value of the Bitcoin that customers transferred to Reynolds and Control-Finance by relying on historical pricing data that was published on the website known as CoinMarketCap, https://www.coinmarketcap.com/.  Vilenskiy Decl. ¶¶ 28-30.  Courts have identified CoinMarketCap as a reliable valuation tool for these purposes.  *See CFTC v. McDonnell*, 332 F. Supp. 3d 641, 670-71 (E.D.N.Y. 2018) (recognizing that CoinMarketCap is "a widely-used website . . . that publishes aggregate data from spot exchanges worldwide for more than a hundred virtual currencies" and "is used frequently by news publications to report on prices of virtual currencies").

This rule "tracks the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting party." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). "The dispositions of motions for entries of defaults and default judgments . . . are left to the sound discretion of a district court." *Hosking v. New World Mortg., Inc.*, 570 F. App'x 28, 31 (2d Cir. 2014) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir.1993)). A court may enter default judgment "if liability is established as a matter of law when the factual allegations of the complaint are taken as true." *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015).

Here, Reynolds was properly served and has failed to answer or otherwise file a responsive pleading. ECF Nos. 21, 24-25. Upon the Commission's request, the Clerk of Court entered default against Reynolds on April 6, 2020. ECF No. 28. Reynolds is an adult who is not incompetent and is not currently on active duty in any branch or division of the United States military. Colarusso Decl. ¶ 9. This case, therefore, does not implicate the Servicemembers Civil Relief Act, 50 U.S.C. § 3901 *et seq.* (2018), and, for the reasons stated more fully below, default judgment is appropriate and should be entered.

## 1. The Court Has Jurisdiction, and Venue Properly Lies in This District.

The Court possesses jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), which authorizes the Commission to seek injunctive and other relief in a U.S. district court against any person whenever it shall appear to the Commission that such person has engaged in any act or practice that violates the Act or Regulations. Compl. ¶ 14. The Commission has the authority to bring this action, and the Court has jurisdiction to hear it, because, as described in the Complaint, Reynolds engaged in acts and practices constituting

violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2018), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2019).  The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).

The Court may also exercise specific jurisdiction over Reynolds because he committed the violations of the Act and Regulations alleged in the Complaint within the United States, among other places.[6]  Specifically, Reynolds solicited and collected Bitcoin from customers residing in this District and elsewhere in the United States.  Compl. ¶¶ 16, 25; Koh Decl. ¶ 8(b); Colarusso Decl. ¶ 7.[7]  The exercise of personal jurisdiction over Reynolds is also reasonable under the circumstances.  The Commission has a congressional mandate to seek relief against individuals who are alleged to have participated in violations of the Act and Regulations.  To hold that Reynolds is not subject to the jurisdiction of this Court, despite his solicitation of customers in the United States and misappropriation of their digital assets, would compromise the Commission's mandate and lead to an unjust outcome.  *See SEC v. Syndicated Food Servs.*

---

[6] Where a federal statute provides for nationwide service of process, a district court may exercise personal jurisdiction over a foreign defendant if that defendant has sufficient contacts with the United States as a whole rather than with any particular state or other geographic area.  *See CFTC v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 381 (S.D.N.Y. 2019) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." (quoting *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013))).  Because Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), authorizes nationwide service of process with respect to requests for injunctive relief, courts use the entirety of the United States as the "relevant forum" for any minimum contacts analysis in cases where, as here, the Commission seeks such relief.  *See, e.g.*, *TFS-ICAP*, 415 F. Supp. 3d at 382-88 (holding that the exercise of specific personal jurisdiction over a defendant who was a U.K. citizen and resident was proper in the Commission's action against him for violations of the Act where the defendant had maintained supervisory control over brokers in the United States who allegedly communicated fake bids and offers and fake trades to their clients in the foreign exchange options market).

[7] In addition, the Control-Finance Website—through which nearly every deposit transaction occurred—was registered to and hosted by a web service provider in San Francisco, California.  Compl. ¶ 26; Koh Decl. ¶ 12.

*Int'l, Inc.*, No. 04-cv-1303, 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (noting court must

consider the federal interest in adjudicating the dispute).

Finally, because Reynolds transacted business in this District through his solicitation of

customers and committed acts and practices in violation of the Act in this District (Compl. ¶¶ 16,

25; Koh Decl. ¶ 8(b)), venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7

U.S.C. § 13a-1(e) (2018).

> **2.      The Well-Pleaded Complaint Establishes That Reynolds's Fraudulent
> Scheme in Connection with Contracts of Sale of Bitcoin, a Commodity
> in Interstate Commerce, Violated Section 6(c) of the Act and
> Regulation 180.1 (Count I – Fraud by Deceptive Device or
> Contrivance).**

Section 6(c)(1) of the Act makes it "unlawful for any person, directly or indirectly, to use

or employ, or attempt to use or employ, in connection with . . . a contract of sale of any

commodity in interstate commerce, . . . any manipulative or deceptive device or contrivance, in

contravention of [the Regulations]."  7 U.S.C. § 9(1) (2018).  In support of Section 6(c)(1), the

Commission has adopted Regulation 180.1(a), which makes it unlawful for any person, in

connection with any contract of sale of any commodity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative
> device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a
> material fact or to omit to state a material fact necessary in order to
> make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of
> business, which operates or would operate as a fraud or deceit upon
> any person . . . .

17 C.F.R. § 180.1(a) (2019).  To establish a violation of these provisions, the Commission need

only show that a person (1) engaged in prohibited conduct (i.e., employed a fraudulent scheme;

made a material misrepresentation, misleading statement, or deceptive omission; or engaged in a

business practice that operated as a fraud); (2) in connection with the sale of a commodity in interstate commerce; (3) with scienter. *McDonnell*, 332 F. Supp. 3d at 717 (entering judgment against defendants for violations of Section 6(c)(1) and Regulation 180.1(a) following a bench trial where they operated a deceptive and fraudulent virtual currency trading scheme and misappropriated investor funds); *see also CFTC v. Gelfman Blueprint, Inc.*, No. 17-cv-7181, 2018 WL 6320656, at *8-9 (S.D.N.Y. Oct. 16, 2018) (entering default judgment against defendants who violated Section 6(c)(1) and Regulation 180.1(a) by fraudulently soliciting and receiving funds from customers for the purpose of entering into contracts of sale of Bitcoin through electronic web-based trading platforms).  Here, the Commission satisfies each of these elements.

### a.      Reynolds's Prohibited Conduct

As detailed in the Complaint, Reynolds, acting together with Control-Finance, engaged in prohibited conduct under Section 6(c)(1) of the Act and Regulation 180.1(a) by making material misrepresentations and omissions to their customers, knowingly or with reckless disregard for the truth, as part of a scheme to solicit and misappropriate their customers' Bitcoin deposits. "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed." *CFTC v. Rolando*, 589 F. Supp. 2d 159, 168 (D. Conn. 2008) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). The representations should be viewed through the eyes of an "objectively reasonable" person who would interpret the overall message. *R.J. Fitzgerald*, 310 F.3d at 1328-29.  A statement or omission is material "if a reasonable investor would consider it important in deciding whether to make an investment." *McDonnell*, 332 F. Supp. 3d at 720 (*quoting CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1327 (11th Cir. 2018)).  "[M]isrepresentations concerning profit and risk go to

11

the heart of a customer's investment decision and are therefore material as a matter of law." *CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000), *aff'd in relevant part sub nom.*, *CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

Among other material misrepresentations, Reynolds falsely represented to customers that: (i) he traded their Bitcoin deposits in the virtual currency markets; (ii) he employed specialized virtual currency traders to manage customers' deposits; (iii) all Bitcoin deposited with Control-Finance yielded guaranteed daily and monthly profits; and (iv) he practiced risk diversification and trade allocation strategies to protect customers from volatility.  In addition to making misrepresentations, Reynolds omitted material information from his solicitations of prospective customers, including that he misappropriated customers' deposits and that so-called profit payments were in fact the diverted principal deposits of other victims.  As a reasonable investor would consider profitability and the use of funds central to making an investment decision, Reynolds made material misrepresentations and omissions to customers.

Reynolds also engaged in prohibited conduct by misappropriating customers' Bitcoin deposits through circuitous blockchain transactions that moved the deposits from Single-Use Addresses to larger Pool Addresses under his control.  *See McDonnell*, 332 F. Supp. 3d at 719 ("Misappropriation of customer funds constitutes fraud that violates 6(c)(1) of the Act and Regulation 180.1(a).").  For all of these reasons, Reynolds employed a fraudulent scheme in violation of Section 6(c)(1) and Regulation 180.1(a).

### b.   In Connection with a Contract of Sale of a Commodity in Interstate Commerce

Reynolds's fraudulent acts were also in connection with, and contemporaneous with, contracts of sale of a commodity in interstate commerce.[8]  First, Bitcoin is a "commodity" within the meaning of Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2018).  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by [the] CFTC as a commodity. . . . They fall well-within the common definition of 'commodity' as well as the [Act's] definition of 'commodities' as 'all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in." (quoting 7 U.S.C. § 1a(9) (2018))), *reconsideration denied*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018); *Gelfman Blueprint*, 2018 WL 6320656, at *8 ("Virtual currencies such as Bitcoin are encompassed in the definition of "commodity" under Section 1a(9) of the Act."); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 495-98 (D. Mass. 2018) (holding that a non-Bitcoin virtual currency is a "commodity" under the Act).

Second, the "in connection with" requirement of Section 6(c)(1) of the Act and Regulation 180.1 is satisfied in this case because the contracts of sale and the fraud were not independent events.  *See McDonnell*, 332 F. Supp. 3d at 722-23 (citing *SEC v. Zandford*, 535 U.S. 813, 819 (2002), for the proposition that the "in connection with" requirement should be construed flexibly, "not technically and restrictively").[9]  Reynolds's fraudulent scheme relied on inducing customers to execute contracts of sale to purchase Bitcoin for the purpose of depositing it with Control-Finance for trading.  To facilitate these transactions, Reynolds included

---

[8] Section 1a(13) of the Act, 7 U.S.C. § 1(a)(13) (2018), defines the term "contract of sale" to include sales, agreements of sale, and agreements to sell.

[9] "In interpreting the 'in connection with' requirement of the Commodities Exchange Act, courts generally look to interpretations of the 'in connection with' requirement of [Section] 10(b) of the Securities Exchange Act."  *SEC v. Lee*, 720 F. Supp. 2d 305, 338 (S.D.N.Y. 2010) (addressing Commission claims under Section 4c(b) of the Act and Regulation 33.10).

hyperlinks on the main page of the Control-Finance Website that directed visitors to virtual currency payment processors where users could purchase Bitcoin.  Compl. ¶¶ 2, 25.  Reynolds also made numerous material misrepresentations directly related to the making of contracts of sale of Bitcoin.  During the Relevant Period, he solicited Bitcoin deposits by representing on the Control-Finance Website that all deposits "are used in real trading activities"—effectively, contracts of sale—"without exception."  Compl. ¶ 47(a); Koh Decl. ¶ 28.  At other times, he identified specific Bitcoin trades that he claimed to execute on behalf of customers.  Compl. ¶¶ 50-53; Koh Decl. ¶¶ 28-30.  Both his efforts to induce the purchase of Bitcoin and his misrepresentations about Bitcoin trading satisfy the "in connection with" test.  *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999) ("The Second Circuit has broadly construed the phrase 'in connection with' . . . to mandate only that the act complained of somehow induced the purchaser to purchase the security at issue."); *McDonnell*, 332 F. Supp. 3d at 723 (holding that material misrepresentations and omissions and misappropriation of customer funds relating to proposed trading in virtual currency was in connection with contracts of sale of commodities in interstate commerce).[10]

### c.    Scienter

Finally, to establish the scienter element, the Commission need only show that Reynolds's conduct was intentional or reckless, and this standard is satisfied if a defendant "intended to defraud, manipulate, or deceive, or if [the] [d]efendant's conduct represents an extreme departure from the standards of ordinary care."  *R.J. Fitzgerald*, 310 F.3d at 1328.  It is

---

[10] The fact that Reynolds misappropriated customers' Bitcoin deposits without executing the promised trades does not alter this result.  *Cf. Zandford*, 535 U.S. at 821 (accepting the SEC's interpretation that the "in connection with" requirement is met where "a broker . . . accepts payment for securities he never intends to deliver"); *Fishman v. Philadelphia Fin. Life Assurance Co.*, No. 11-cv-1283, 2016 WL 2347921, at *8 (S.D.N.Y. May 3, 2016) ("That no covered securities were actually purchased is of no import . . . What matters is that the plaintiff intended to invest in covered securities.").

also satisfied when a defendant's conduct involves "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading customers which is either known to the [d]efendant or so obvious that [d]efendant must have been aware of it." *Id.* (quotation omitted).  In this case, Reynolds acted with scienter when he misled and defrauded customers by knowingly making material misrepresentations and omissions and by misappropriating their deposits.  The intentional nature of Reynolds' conduct is further evidenced by his refusal to return customers' deposits.  *See McDonnell*, 332 F. Supp. 3d at 721-22.

### B.    Remedies and Damages

#### 1.    Permanent Injunction

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), empowers the Commission to seek permanent injunctive relief whenever it appears to the Commission that any person has engaged in, is engaging in, or is about to engage in any violation of the Act or Regulations.  "[I]n actions for a statutory injunction, such as this, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits, but only that there is a reasonable likelihood that the wrong will be repeated.  *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977) (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807-09 (2d Cir. 1975)); *see also SEC v. Aaron*, 605 F.2d 612, 623 (2d Cir. 1979) ("The critical question in determining whether the public interest requires the imposition of a permanent injunction is 'whether there is a reasonable likelihood that the wrong will be repeated.'" (quoting *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972))), *vacated on other grounds*, 446 U.S. 680 (1980).  In determining whether a "reasonable likelihood" of future violations exists, courts generally consider the egregiousness of the defendant's actions; the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the

defendant's recognition of the wrongfulness of the conduct; and the likelihood that the defendant's customary business activities will present opportunities for future violations. *See Mgmt. Dynamics*, 515 F.2d at 807. "[T]he likelihood of future violations of law can be inferred from defendants' past illegal conduct." *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 677 (S.D.N.Y. 1979).

As set forth above, this is a case where Reynolds knowingly stole nearly all of the Bitcoin entrusted to him. Rather than admitting his wrongdoing, Reynolds took pains to conceal his fraud by, among other things, fabricating account balances and making "Ponzi" scheme-like payments to customers. Given his sustained misconduct and high degree of scienter, a permanent injunction is warranted. The Commission respectfully requests that the Court enter a permanent injunction in the form of or consistent with the language contained in the proposed order filed herewith.

### 2.    Restitution, Civil Monetary Penalty, and Post-Judgment Interest

"Although a plaintiff seeking to recover damages against a defaulting defendant must prove its claim through the submission of admissible evidence, a hearing is unnecessary so long as (1) the [c]ourt has determined the proper rule for calculating damages, and (2) the plaintiff's evidence establishes, with reasonable certainty, the basis for the damages specified in the default judgment." *CFTC v. 4X Solutions, Inc.*, No. 13-cv-2287, 2015 WL 9943241, at *2 (S.D.N.Y. Dec. 28, 2015) (citations omitted) (report and recommendation), *adopted by* 2016 WL 397672 (S.D.N.Y. Jan. 29, 2016). The court may rely on affidavits or documentary evidence in the record to determine the appropriate sum rather than hold an evidentiary hearing. *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012). Here, a hearing is not necessary because all damages the Commission seeks

are substantiated in detail by the declarations and exhibits that accompany this Motion.

### a.   Restitution

Section 6c(d)(3)(A) of the Act, 7 U.S.C. § 13a-1(d)(3)(A) (2018), authorizes the Commission to seek and the Court to order "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."  Restitution exists to restore the status quo and make the injured party whole.  *Porter v. Warner Holding Co.*, 328 U.S. 395, 402 (1946) (equitable restitution consists of "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant").  Accordingly, courts calculate restitution "as the difference between what [a defendant] obtained and the amount customers have already received back."  *CFTC v. Ross*, No. 09-cv-5443, 2014 WL 6704572, at *3 (N.D. Ill. Nov. 26, 2014).  Where, as here, a defendant engages in systematic and pervasive fraud, all funds obtained by the illegal enterprise may be included in the calculation of restitution.  *See McDonnell*, 332 F. Supp. 3d at 726-27 (holding that in cases of pervasive fraud under the Act, the appropriate calculation of restitution includes all customer losses even where only a subset of those customers testify to the losses they sustained on the grounds that reliance on the defendant's fraud is presumed); *see also CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1352 (S.D. Fla. 2014) (determining in connection with violations of Section 6(c) of the Act and Regulation 180.1 that "[t]he systematic and pervasive nature of [the defendant's] fraud necessitates restitution not only for the retail customers who testified to the losses they sustained due to [the defendant's] scheme, but for all of [defendant's] customers as well").

Here, Reynolds solicited approximately $143,000,000 from customers, and the Commission has confirmed that he passed at least $13,411.17 of the funds he stole from some customers to others through "Ponzi" scheme-like payments.  *See* Compl. ¶¶ 1, 5, 40, 62, 78-80;

Vilenskiy Decl. ¶¶ 27-30; Colarusso Decl. ¶ 15.[11]  Accordingly, the Commission requests that the Court order Reynolds to pay restitution in the amount of $142,986,589, which reflects the total customer losses proximately caused by Reynolds's violations of the Act ($143,000,000) minus the funds the Commission presently understands he returned to customers ($13,411.17), together with any post-judgment interest.  *See McDonnell*, 332 F. Supp. 3d at 726-27 (ordering restitution in the amount of funds received from all customers as part of fraudulent virtual currency trading scheme, reduced by the value of a virtual currency transfer by the defendant to one investor).

**b.    Civil Monetary Penalty**

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), and Regulation 143.8(a)(4)(ii)(B), 17 C.F.R. § 143.8(a)(4)(ii)(B) (2019), authorize the imposition of a civil monetary penalty ("CMP") equal to the higher of  $185,242 per violation[12] or triple a defendant's monetary gain from each violation of the Act or Regulations.  The Court is "free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent."  *CFTC v. Trimble*, No. 11–cv–02887, 2013 WL 317576, at *9 (D. Colo. Jan. 28,

---

[11] In support of the Motion, the Commission has submitted the Declarations of Shane Boulware and Daniel Stratton, both of whom were customers of Control-Finance and have identified small payments they received from Control-Finance during the Relevant Period.  Mr. Boulware received $10,724.65 of the $32,000 he deposited with Control-Finance.  Boulware Decl. ¶ 27.  In the case of Mr. Stratton, he received 0.54 Bitcoin from Control-Finance, which the Commission has conservatively valued at $2,686.52.  Stratton Decl. ¶¶ 23, 27-28; Vilenskiy Decl. ¶ 35.  Taken together, those payments total $13,411.17.  The payments to Mr. Boulware and Mr. Stratton described in their Declarations are the only specific instances of Reynolds returning funds to customers of which the Commission is presently aware (*see* Colarusso Decl. ¶ 15), and the burden would fall on Reynolds to counter the Commission's calculations.  *See FTC v. Instant Response Sys., LLC*, No. 13-cv-00976, 2015 WL 1650914, at *11 (E.D.N.Y. Apr. 14, 2015) (holding that in calculating restitution under the FTC Act and related laws, the government must only "reasonably approximate[]" the amount of customers' net losses, and then the burden shifts to the defendant to show that those figures are inaccurate (quoting *FTC v. Verity Int'l*, 443 F.3d 48, 67 (2d Cir. 2006))).  As the Second Circuit has recognized, "any risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty."  *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996) (quoting *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995)) (discussing disgorgement under federal securities laws).

[12] Pursuant to 17 C.F.R. § 143.8(b)(1) (2019), the allowable inflation-adjusted civil monetary penalty is $185,242 per violation of the Act (effective Jan. 13, 2020) for non-manipulation claims brought in federal injunctive actions under 7 U.S.C. § 13a-1.

2013) (citing *Miller v. CFTC*, 197 F.3d 1227, 1236 (9th Cir. 1999)).  In determining the amount of a CMP, courts consider the nature of the violation of the Act or Regulations, whether scienter was present, the consequences of the violation, the financial benefit to defendants, and the harm to customers.  *See CFTC v. Arrington*, 998 F. Supp. 2d 847, 875 (D. Neb. 2014).  "Conduct that violates the core provisions of the Act, such as customer fraud, is considered serious." *McDonnell*, 332 F. Supp. 3d at 728 (citing *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995)).

The facts of this case warrant the imposition of a significant CMP.  "In light of the core relationship of the anti-fraud regulations to the purpose of the Act, the egregiousness of [Reynolds's] intentional conduct to misappropriate customer and investor funds, . . . and [his] failure to accept any responsibility or attempt to ameliorate the wrongful conduct," *id.*, the Commission requests that the Court order Reynolds to pay a CMP equal to three times the value of the Bitcoin he misappropriated from customers ($143,000,000), or $429,000,000, together with any post-judgment interest.  Such a penalty is within the Court's statutory authority, will protect the Commission's regulatory interests and integrity of the markets, and will send a clear message to deter others from engaging in a similar fraudulent scheme.  *See, e.g.*, *id.* (after trial, imposing CMP of triple the gain); *CFTC v. Dean*, No. 18-cv-00345, 2018 WL 4573029, at *12 (E.D.N.Y. July 9, 2018) (default) (imposing CMP of triple the gain); *CFTC v. SK Madison Commodities, LLC*, No. 14-cv-02025, 2014 WL 3887755, at *5 (S.D.N.Y. June 9, 2014) (entering default judgment and ordering a CMP of "triple the amount misappropriated" where the defendants "committed repeated violations of core provisions of the [Act] and Regulations"); *Rolando*, 589 F. Supp. 2d at 174 (noting that "obtaining customer funds and then hiding [the defendant's] true conduct from his customers were serious violations of the Act . . . that strike at

19

the very core of the Act's regulatory system," requiring "a substantial civil monetary penalty");

*CFTC v. Emerald Worldwide Holdings, Inc.*, No. 03-cv-8339, 2005 WL 1130588, at \*13 (C.D.

Cal. Apr. 19, 2005) (imposing CMP of approximately triple the gain).[13]

### c.    Post-Judgment Interest

The Commission also requests that the Court order Reynolds to pay post-judgment

interest on the restitution and civil monetary penalty amounts.  Post-judgment interest should be

paid at the then-prevailing Treasury Bill rate, pursuant to 28 U.S.C. § 1961(a) (2018).

## IV.    CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the

present Motion, enter final judgment by default against Reynolds, and, to administer the

permanent injunction, restitution judgment, and civil monetary penalty, issue a final order in the

form of the proposed order submitted herewith.

Dated:  August 20, 2020              Respectfully submitted,

By:  s/Julia C. Colarusso
     Julia C. Colarusso (admitted *pro hac vice*)
     Jonah E. McCarthy (S.D.N.Y. Bar No. JM1977)
     Luke B. Marsh (admitted *pro hac vice*)
     Paul G. Hayeck
     COMMODITY FUTURES TRADING COMMISSION
     Division of Enforcement
     1155 21st Street, NW, Washington, DC 20581
     Telephone:  (202) 418-6044 (Colarusso direct)
     jcolarusso@cftc.gov
     jmccarthy@cftc.gov
     lmarsh@cftc.gov
     phayeck@cftc.gov

     *Attorneys for Plaintiff*

---

[13] Although the Commission seeks full relief, it recognizes that tripling the monetary gain in this case results in a number that may be considered outsized.  As set forth above, the Court has discretion to fashion a CMP that is less than triple Reynolds's monetary gain provided that the CMP is sufficient to address the gravity of the offense and to act as a deterrent.